UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LUCIAN CELESTINE, a/k/a<br>Lucian Unddascha Celestineaeterus,<br>a/k/a Dillon Joseph Calvetti,<br><br>Defendant. | CR 20-50083<br><br>UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS |

Comes now the United States of America, by and through Assistant United States Attorney Eric Kelderman, and files this memorandum in opposition to the motion to suppress. Docs. 25 and 26. The United States resists the motion in all respects.

**STATEMENT OF FACTS**

The United States anticipates the facts of this matter, to be more fully developed at the hearing on the defendant's motion, will reveal the following. On June 30, 2020, at approximately 2:00 p.m., Pennington County Sheriff's Deputy Jeremy Milstead met with two special agents from the United States Secret Service to approach the defendant. Before speaking with the defendant, Deputy Milstead checked the defendant's information in the local law enforcement database and noted the defendant had a significant history for incidents involving stalking, violation of protection orders, trespassing charges and

burglary. The deputy learned from other law enforcement that the defendant had posted threats against the President of the United States and had recently attempted to acquire firearms.

Special Agents Abbruscato and Flint were aware that on September 1, 2019, the defendant contacted the FBI reporting: he heard the voice of God with instructions to kill people; he believed President Trump was a rapist and he had an urge to kill rapists; the defendant stated he did not have the mean or desire to harm anyone; and, the defendant heard voices around the time his grandfather died. The defendant's mother had reported the defendant was taken to a mental health facility following an incident at his grandmother's house when he accused her of hiding his new phone. The defendant was diagnosed, according to his mother, as schizophrenic.

On November 14, 2019, the defendant called PIOC reporting he had strong urges to kill rapists and he heard a voice telling him that President Trump raped his aunt. The defendant described contemplating the instructions of the voices he heard to purchase a rifle to assassinate the President. However, he later realized the voices were coming from the CIA's "God's Voice" system. The defendant claimed the CIA was part of the deep state and wanted the defendant to remove President Trump for them (the CIA). The defendant also believed the voices may be coming from Pope Francis due to his distrust of the catholic church. The defendant claimed that the Pope was also a rapist and he (the defendant) wanted all rapists to die. The defendant denied taking any steps to meet the voices' demands. He did not have any plans to purchase a weapon or

travel. He claimed the purpose of his call was to exonerate the President because he was not behind the voices in his head.

Sometime prior to June 29, 2020, law enforcement learned the defendant attempted to make a purchase of a firearm on a website called "Armslist." The firearm was listed for sale on the website by a lieutenant with the Brookings, SD, police department. The lieutenant described some oddities of his interaction with the proposed buyer (the defendant), including that his knowledge of firearms was limited and he did not seem to understand the procedure. Further, the defendant was adamant about having the gun by Friday, June 26, 2020. The defendant opted not to purchase the gun from the lieutenant because he did not want to travel that far. At no point did the defendant mention the President to the Brookings PD lieutenant.

On June 30, 2020, Deputy Milstead and Special Agents George Abbruscato and Randall Flint made contact with the defendant at his residence. The special agents were dressed in plain clothes. The defendant's mother was outside as they approached the house. She told law enforcement she was not concerned the defendant would harm himself or others. She confirmed the defendant did hear a lot of voices but did not act on them as far as she knew. She reported the defendant was just waking up.

The defendant walked out of the house, down the porch, near his garage. The agents and deputy identified themselves to the defendant. The defendant went to put a dog back in the residence and his mother departed at that time. The agents briefly informed the defendant about the past calls he had made and

asked if he remembered those calls. He indicated he did and agreed he had previously said he wanted to shoot rapists in past calls. The defendant reported he had recently acquired a rifle for target practice. The defendant said he understood he was allowed to own a firearm. He denied any intentions to harm the president or anyone else. The defendant admitted smoking marijuana all the time and that he had recently smoked the day before.

The defendant gave consent to search his car but voiced concern about searching his room. The agent then asked if he could just look in the defendant's room. The defendant questioned whether he would get arrested if there was weed in his room. When law enforcement explained that is not why they were there, he indicated it was ok. The defendant signed a form authorizing consent to search the car and told law enforcement the gun was in his trunk. He accompanied the agents unrestrained to where his vehicle was parked.

While speaking with the law enforcement, the defendant was not restrained in any way. No effort was made to position him in any particular location outside. He was allowed to move around freely during the searches. The firearms of the special agents were covered during the duration of their interactions with the defendant, except for a brief time when a shirt of one of the agents was stuck over the gun so it was not covered. Deputy Milstead was in his patrol uniform with his firearm present. His body-worn camera captured most of the interaction.

In the trunk of the vehicle, there was a rifle and ammunition. There was also a receipt for ammunition purchased the day before. The defendant reported

he had completed high school and was single and currently unemployed.  He denied being under any current treatment but was able to describe his past treatment and the time frames.

The defendant was taken into custody and transported to the Public Safety Building.  He was placed in an interview room, in handcuffs.  He was allowed to walk around the room.  He denied he was currently hearing any voices.  He reported the last time he heard them was several days earlier.  He was provided water.  The defendant was informed he was going to be placed on a mental hold.

The defendant wanted to dispute his mental hold with the deputy as well as his right to have a firearm.  He appeared visibly frustrated about the decision for a mental hold.  The deputy began explaining the reasons law enforcement was seeking that hold, including the voices the defendant heard several days earlier.  The defendant acknowledged the voices told him to kill rapists and the voices told the defendant to shoot the President.  The defendant that is what he was thinking about when he bought the rifle but had not told law enforcement the truth earlier because he did not want "to end up here."  The defendant was then advised of his <u>Miranda</u> rights. He acknowledged without hesitation that he understood his rights and wanted to keep talking to the deputy.  He then made additional admissions detailing his plan to kill the President.  The defendant was then arrested for the state offense of making terroristic threats.

Additional evidence will be offered at the evidentiary hearing.

## ARGUMENT AND AUTHORITIES

**A. The defendant's statements were not involuntary**

    **1. The statement outside his home.**

The defendant argues his statement outside his home was not voluntary because "his will was overborne and he was impermissibly coerced into giving the statement." Doc. 26 at 6. "The appropriate test for determining the voluntariness of a confession is 'whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will.'" United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir. 1990) (quoting United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989)). A statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). "On the other hand, a statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004).

In evaluating whether a statement was voluntary, the court "looks at the totality of the circumstances." Wilson v. Lawrence County, 260 F.3d 946, 952 (8th Cir. 2001). In applying the totality-of-the-circumstances analysis, the Court focuses on the conduct of the agents and a defendant's capacity to resist pressure to confess, considering the specific interrogation tactics employed, the details of the interrogation, and the characteristics of the accused. See LeBrun, 363 F.3d at 726.

6

There is no evidence that the agents or deputy made any threats, promises, or used violence towards the defendant. In fact, the defendant does not allege that to be the case in his motion. Instead, the defendant argues his will was overborne because he had been previously committed to a mental health hold and therefore more likely to be susceptible to undue influence coupled with a "fear of prison" and "reminder of his previous question by the FBI." Doc. 26 at 7.

In determining whether the defendant's will was overborne, courts consider "the conduct of the officers and characteristics of the accused." LeBrun, 363 F.3d at 724. Some of the relevant factors include: the defendant's prior experience with law enforcement; nature of interrogation including duration and location; whether the defendant was in custody or otherwise restrained; whether law enforcement employed hostile tactics; and defendant's intelligence and mental state which would render him peculiarly susceptible to having his will overborne. See, e.g., id. at 726. Here, the record will establish the defendant had extensive prior experience with local law enforcement and agents. The nature of the interaction was non-confrontational with no hostile tactics employed, as will be shown by the video footage. The location was primarily outside the defendant's residence on a summer day, except for a brief time inside. The duration was not extensive and further evidence on this will be offered at the hearing. As for his intelligence and mental state, the video footage depicts that the defendant is well-spoken and appeared to be in a state of

7

comprehension. At no point during the questioning at his residence did he seem agitated or depict behaviors of being in a mental crisis.[1]

Importantly, "[a] statement cannot be rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity." Anaya, 715 F. Supp. 2d, 931-32 (citing Colorado v. Connelly, 479 U.S. 157, 164, 167 (1986)). Here, there is no suggestion or evidence that law enforcement acted in any way to overbear the defendant's will.

**B.    Search of defendant's vehicle & locating firearm**

**1.    The seizure of defendant was legal.**

It is unclear at what point the defendant is claiming the defendant was "seized." There is no indication the defendant was in custody before he was handcuffed. Nothing about his movement was restrained leading up to the search of his trunk.

**2.    The consent search of vehicle was lawful.**

The defendant argues locating firearm is the result of the illegal detention and "unmirandized statements." Doc. 26 at 7. The defendant signed a written consent to search form for his vehicle. Recently, the Eighth Circuit in United States v. Tapia-Rodriguez, 968 F.3d 891, 895 (8th Cir. 2020), reiterated, "We have never held that a request to search must be preceded by Miranda warnings, or that a lack of Miranda warnings invalidates a consent to search." Id. (citing United States v. Payne, 119 F.3d 637, 643 (8th Cir.), cert. denied, 522 U.S. 987,

---

1. The defendant does raise his voice at one point asking when he was detained. Once the deputy provided an explanation and was informed there would be more information coming, the defendant seemed satisfied and remained compliant.

118 S.Ct. 454, 139 L.Ed.2d 389 (1997)). "Indeed, it is well established that consenting or refusing to consent to a search is not subject to suppression under Miranda." Id.; see, e.g., Cody v. Solem, 755 F.2d 1323, 1330 (8th Cir.), cert. denied, 474 U.S. 833, 106 S.Ct. 104, 88 L.Ed.2d 84 (1985).

## C. The defendant's statements at Public Safety Building

### 1. The statements were voluntary and not in violation of Miranda.

The United States Supreme Court held in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), that any time a person is taken into custody for questioning they must be advised of their Fifth Amendment right to be free from self-incrimination in order "to counteract the 'inherently compelling pressures' of custodial interrogation." Arizona v. Roberson, 486 U.S. 675, 681, 108 S. Ct. 2093, 100 L.Ed.2d 704 (1988) (quoting Miranda, 384 U.S. at 467). Miranda warnings are required prior to questioning "whenever a suspect is (1) interrogated (2) while in custody." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir.1990).

In this case, the Miranda warnings were provided. Before they were provided, the defendant made a number of statements that were not the result of interrogation. Some of the statements were apparently made before that advisement was made. The United States concedes the defendant was in custody for all times after he was transported from his house.

"Interrogation" is the "direct questioning [by a law enforcement officer] or any practice reasonably likely to evoke an incriminating response from a

9

suspect." Id. (citing Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L.Ed.2d 297 (1980)).

> Interrogation occurs when a law enforcement officer engages in "either express questioning or its functional equivalent," which includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnotes omitted). "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* at 301, 100 S.Ct. 1682.

United States v. Jackson, 852 F.3d 764, 771 (8th Cir. 2017).

The defendant waived his rights under Miranda and agreed to speak with law enforcement. An officer must provide complete warnings that convey to a suspect all his rights as required by Miranda. Missouri v. Seibert, 542 U.S. 600, 611-12 (2004) (noting that "Miranda addressed 'interrogation practices … likely … to disable [an individual] from making a free and rational choice about speaking, 384 U.S., at 464–465, 86 S.Ct. 1602, and held that a suspect must be 'adequately and effectively' advised of the choice the Constitution guarantees, *id.,* at 467, 86 S.Ct. 1602). After the agent read the Miranda rights, the defendant acknowledges he understood them. Here, the defendant unequivocally waived his right to remain silent. He expressed no hesitation when asked if he understood this right and then when asked if he wanted to waive it.

"Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Adams, 820 F.3d at 323 (citing Berghuis, 560 U.S. at 384). There is no dispute here that the defendant was

advised of his Miranda rights. The entirety of the interaction shows the defendant was not coerced into making any statements. The circumstances the defendant cites do not overcome the fact that he was advised of his rights, indicated he understood, and chose to speak with the deputies.

### 2. The defendant's statements were voluntary.

"The same analysis concerning whether a defendant's waiver of his Miranda rights was voluntary applies to determine the voluntariness of a defendant's statement under the Fifth Amendment." United States v. Brave Hawk, No. 3: 15-CR-30090-RAL, 2016 WL 311263, at *4 (D.S.D. Jan. 26, 2016) (citing United States v. Makes Room for Them, 49 F.3d 410, 414 (8th Cir. 1995)). The United States is required to "prove by a preponderance of the evidence that the Defendant's statement made to police was voluntary." United States v. Astello, 241 F.3d 965, 965 (8th Cir. 2001); see also United States v. Scares the Hawk, 683 F. Supp. 2d 1036, 1038–39 (D.S.D. 2009).

> Factors which the Court may weigh in determining whether a statement is voluntary include the prolonged nature of the questioning, . . . the defendant's subjective understanding of his Miranda rights, . . . the age of the defendant, his lack of education, or his low intelligence, . . . the defendant's prior contact with law enforcement, . . . and the use of physical punishment such as deprivation of food or sleep.

Scares the Hawk, 683 F.Supp.2d at 1039 (internal citations omitted).

The defendant's statements to law enforcement were voluntary under the totality of the circumstances. Law enforcement advised the defendant of his Miranda rights, which he waived. "[A]s Miranda holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever

11

coercion is inherent in the interrogation process." Burbine, 475 U.S. at 427; see Davis, 512 U.S. at 460; Berghuis, 130 S. Ct. at 2260. Law enforcement was forthcoming with the defendant about why they were there and the information they had. There were no threats, violence, or promises made to the defendant by law enforcement.

    a.    **Characteristics of the accused.**

As will be shown, the defendant has an extensive history with law enforcement and the legal system. The defendant is a 29-year-old male with previous interactions with law enforcement and the criminal justice system. See *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) ("A history of interaction with the criminal justice system supports an inference that an interviewee is familiar with his constitutional rights and that his statements to the police are voluntary."). There is nothing to indicate the defendant had any problems understanding the Miranda rights; to the contrary, he expressly stated he understood them.

    b.    **Nature of interview.**

The questioning of the defendant was not prolonged. The agents did not employ any tactics such as deprivation of food, sleep, or breaks. The defendant did not at any time request any accommodations. The agents did not raise their voices or act in such a way as may be considered physically imposing.

## CONCLUSION

The United States respectfully requests this Court deny the defendant's motion to suppress. Should it be necessary after the hearing, the United States requests permission to provide supplemental briefing to the Court.

Dated this 6th day of November, 2020.

> RONALD A. PARSONS, JR.
> United States Attorney
> By:
>
> */s/ Eric Kelderman*
> _____
> Eric Kelderman
> Assistant United States Attorney
> 515 Ninth Street, Suite 201
> Rapid City, SD 57701
> Telephone: (605) 342-7822
> Email: Eric.Kelderman@usdoj.gov